### 73407. KETCHAM v. FRANKLYN GESNER FINE PAINTINGS, INC.
(353 SE2d 44)

BIRDSONG, Chief Judge.

Fraud in Sale of Painting — Damages. As relevant to the resolution of the issues involved in this case, the facts show that prior to September 11, 1980, one Jerry Melton, who lived in Atlanta, phoned Ketcham and offered Ketcham an oil painting ostensibly painted by Martin Johnson Heade, an esteemed American painter of the 19th

century. Ketcham asked Melton to bring the painting to Ketcham's studio (sales premises). Ketcham determined from conversation with Melton that Melton had lent a brother in North Carolina a sum of money (apparently $5,000). This brother had died before the debt was repaid. The brother's widow offered an oil painting (the ostensible Heade) as payment in full for the debt. Melton apparently had agreed and taken possession of the painting.

Subsequently, Melton had run afoul of the IRS on an alleged tax delinquency and was seeking to sell the Heade for $35,000 to help defend a pending suit by the IRS. Melton informed Ketcham that he (Melton) would take the painting to New York in a week's time for sale there, but would give Ketcham one week to find a buyer. Ketcham issued Melton a receipt for the painting for the purpose of examining the authenticity of the painting. Ketcham placed the painting under a strong white light and a "black" light and this examination showed no apparent discrepancies. Ketcham compared the offered painting against numerous other Heade paintings of the same style and subject and was convinced by his short-term examination that the painting was indeed a Heade. Later the same day Melton returned but this time with his son, Michael Melton. Ketcham agreed to broker the painting for Melton and to pay Melton $25,000 upon sale of the painting. Any money above $25,000 would be for Ketcham to keep. Jerry Melton who brought the painting to Ketcham originally required Ketcham to make out the receipt for the acceptance of the painting for sale to the son Michael rather than to the apparent owner, Jerry Melton. It was explained to Ketcham that the sales agreement was to be placed in Michael's name to avoid the placement of any lien by the IRS upon the sales price of the painting.

On September 11, 1980, Ketcham called Franklyn Gesner in Largo, Florida, where Gesner maintained his business of dealing in fine arts and especially with paintings by 19th century American painters. Ketcham related to Gesner that he (Ketcham) had a painting of or by Heade and inquired if Gesner was interested in obtaining the picture. Gesner inquired about the origin of the picture and Ketcham informed Gesner that the painting had come from an estate in North Carolina. Gesner flew to Atlanta the following day and together with Ketcham examined the picture. Ketcham had displayed one or more catalogues of fine paintings depicting paintings by Heade of the same size and subject as the painting being offered for sale. Ketcham did not inform Gesner that he had received the painting from a man living in Atlanta but reiterated that the painting had come from an estate in North Carolina. It was commonly understood in the art business that a painting from an estate was less likely to be a recent forgery. Neither did Ketcham recount that Melton was selling the painting because of the stress of an IRS suit nor that the

painting's owner was Jerry Melton rather than Michael Melton.

After his comparison of the painting with the known examples of similar paintings by Heade in the catalogues and a close examination of the painting with bright and black lights, Gesner satisfied himself fully that the painting was an authentic Heade. He offered Ketcham $32,500 and Ketcham made the sale.

Gesner had purchased a similar Heade painting approximately two or three months earlier from a young woman who lived in Florida. He had sold a half interest in the first painting to an art compatriot in New York. When the first painting was cleaned, the compatriot noted that the Heade was not one of the artist's best efforts. Nevertheless the painting was offered to an important art auction house in New York in the belief that the painting was in fact one by Heade. The auction house proffered transparencies of the painting to the acknowledged leading American expert in Heade paintings for verification of the authenticity of the painting prior to its being placed in the sale catalogue. The auction house had no reservations concerning the painting but wanted an authentification prior to the auction. The expert verified the authenticity of the painting from his examination of the transparency.

On the day before the sale, by apparent coincidence, the expert was conducting a tour for art students through the auction house. The expert saw the first Heade purchased by Gesner and was struck by the "brightness" of the picture, i.e., the contrast between the darker and lighter colors of paint was unusual for a painting by Heade. The expert made a special effort on the day of the auction to examine the painting more carefully because he had an uneasy feeling about the authenticity of the picture. The auction house was advised to withdraw the painting from sale. Gesner had attended the auction to observe the sale of this earlier obtained Heade and was informed by the expert that a question as to authenticity existed. Gesner then informed the expert that he (Gesner) had a second painting that he had recently purchased (from Ketcham) and asked if the expert would examine both. A complete examination of both paintings by the expert satisfied the expert that one long composition (pressed board) canvas had been cut in half and the two paintings now owned by Gesner had been forged by the same forger. The evidence shows no connection between the young woman in Florida or Melton. Though the evidence was not presented to the jury, it is apparent from the transcript that the convincing factor of forgery to the expert was not the "brightness" of the paintings but was the use of a type of oil paint that was not in use until approximately 1920 whereas Heade had died in 1904.

Upon discovering the paintings were forgeries, Gesner contacted Ketcham and demanded the return of the $32,500 or alternatively for

Ketcham to return the consignment fee (which Gesner believed to be $10,000) and Gesner would seek to recoup the remainder of the loss from the seller Melton. Ketcham denied any liability maintaining he was a wholesaler of the painting rather than a retailer and acted solely on consignment. The evidence further shows that Ketcham was not completely candid or open as to the identity of the seller, Melton, in that Ketcham stated he did not know the whereabouts of Melton when in fact Ketcham probably did have some knowledge of Michael Melton's whereabouts. It was further established that it was the usual custom in the art business that when one dealer sold in good faith a valuable painting to another dealer and that painting was not as represented, the seller would refund the purchase price to the purchaser.

After a tortuous pretrial course, Gesner successfully brought suit against Ketcham in 1985 for the fraudulent sale of the painting. The trial court denied a motion for directed verdict at the completion of Gesner's evidence and at the completion of all the evidence as well as denying a motion for new trial. The ground for the directed verdict and new trial was the asserted absence of overt fraud by Ketcham as to his claim of authenticity of the painting as a Heade. The jury returned a verdict for Gesner of $32,500 in general damages, $6,263 in punitive damages and $31,337 in attorney fees, for a total award of $70,100. Ketcham brings this appeal enumerating ten asserted errors. *Held*:

We first observe that Gesner brought his complaint in three counts, one each in fraud, rescission and breach of contract. During the trial he withdrew the count in rescission. The jury was charged fully on the law of fraud and breach of contract. In its verdict the jury informed the court that it understood from the charge that it was to select between the fraud count and the breach of contract count. The jury based its verdict on the fraud count and rendered no verdict on the breach of contract count. The court with the consent of both parties entered its judgment on the single verdict. Thus the sufficiency of the evidence or the adequacy of the charge on the breach of contract count is not before us on this appeal.

In order to sustain the verdict and judgment in this case, the record must show by a preponderance of the evidence that Ketcham made representations to Gesner that the painting was rendered by Heade; that at the time he made these representations Ketcham knew the painting was not by Heade (or had substantial reasons to doubt the veracity of the representation); that the false representation to Gesner that the painting was by Heade was intended to deceive Gesner; that Gesner made the purchase in reliance upon the representation by Ketcham; and that Gesner sustained the loss as a proximate result of the false representations made by Ketcham. See *Eckerd's Columbia v. Moore*, 155 Ga. App. 4, 5 (270 SE2d 249).

We are satisfied from the transcript that Ketcham represented the painting as an authentic Heade and that Gesner sustained loss because the painting was not an authentic Heade. However, we have overwhelming doubts under the evidence of the presence of any evidence to sustain any of the remaining requisite elements of fraud and deceit.

Search as we might, we have been unable to find any evidence in this transcript to establish that Ketcham knew or had reason to believe the painting was not an authentic Heade. The painting was offered to Ketcham as a Heade and the consignment price accepted by Melton of $25,000 was consistent with a forced sale of a valuable painting. Ketcham performed what apparently was the usual and accepted tests to ascertain overpainting or alterations and found none. The painting was compared with known paintings by Heade of the same subject matter and seemed consistent with those paintings. Gesner, himself an acknowledged expert, determined from his own examination of the painting that the painting seemed to be an authentic Heade. The auction house (one of the world's prestige houses in auctioning highly valuable artifacts) was satisfied it was an authentic Heade. The expert who first examined the companion forgery to the painting sold by Ketcham was satisfied that it was an authentic Heade. Even after the chemical tests established that the paintings were forgeries, the expert concluded the forgeries were "very good." From such evidence, we are unable to conclude there is any evidence in this transcript that established Ketcham was aware or should have been aware the painting he sold to Gesner was not an authentic Heade.

Gesner argues that the unusual circumstances of the sale by Melton to Ketcham should have alerted Ketcham that the picture was of suspicious composition. If the nature of the fraud and deceit had been that Ketcham sold an authentic Heade which had been stolen or to which Ketcham did not have the right to give clear title and possession, Gesner's arguments as to the suspicious circumstances in the procurement of the painting would have more merit. But we find no evidence that shows Ketcham did not fully believe the painting to be a Heade or even any reason to believe it might not be what it was purported to be. Moreover, we find no evidence in the record that Ketcham sought to convince Gesner the painting was by Heade in the face of reservations by Gesner. To the contrary, the evidence is overwhelming that Gesner became convinced that the painting was authentic due to his own expertise and examination of the painting. Thus the evidence likewise does not support the necessary ingredient of fraud and deceit that Gesner was harmed because of his mistaken reliance upon a fraudulent misrepresentation of Ketcham.

Gesner further argues that Ketcham displayed bad faith by re-

fusing to abide by the customs of the trade and return the purchase money when it became apparent the painting was spurious. However, such an argument is more appropriate to Ketcham's procurement of the painting rather than to a question of authenticity. This is relevant to a breach of contract. Inasmuch as the jury did not reach a verdict on the breach of contract count, we need not address that issue.

We are aware that proof of fraud is seldom if ever susceptible of direct proof; thus recourse to circumstantial evidence usually is required. Moreover, we acknowledge that circumstances apparently trivial or almost inconclusive when considered in conjunction may be sufficient to establish proof of fraud. *Durrence v. Durrence*, 224 Ga. 620 (163 SE2d 740); *McGaha v. Kwon*, 161 Ga. App. 216 (288 SE2d 289, 291). Likewise, we proceed under the caveat that it is a matter peculiarly within the province of a jury to determine whether the circumstances establish moral fraud. *Tolar Constr. Co. v. GAF Corp.*, 154 Ga. App. 127 (267 SE2d 635).

Nevertheless, the direction of a verdict is proper where there is no conflict in the evidence as to a material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. *State Farm Mut. Auto. Ins. Co. v. Snyder*, 125 Ga. App. 352 (187 SE2d 878). Moreover, the mere existence of conflicts in the evidence does not render the direction of a verdict erroneous if it was demanded either from the proof or lack of proof on a controlling issue or issues. *Stepp v. Stepp*, 195 Ga. 595 (2) (25 SE2d 6); *Lingo v. Kirby*, 142 Ga. App. 278, 279 (236 SE2d 26).

While we will not assume to weigh the evidence or substitute our appellate judgment for that of the jury or the trial court, we can and must impose our appellate evaluation where there is *no* evidence as to one or more of the essential elements of fraud and deceit. As indicated hereinabove, we will not address the issue as to whether there was evidence to show or support a breach of contract or bad faith in the execution of that contract. But we are constrained to conclude that in the absence of any evidence that Ketcham knew the painting sold to Gesner was a fake, that Ketcham sought to override any reservations by Gesner or that Gesner formed his opinion as to authenticity based upon Ketcham's representations rather than his own expertise and examination, the trial court erred in failing to grant a directed verdict as to the fraud and deceit count upon motion by Ketcham.

The remaining enumerations of error advanced by Ketcham in his appeal are rendered moot by the decision as to the directed verdict and need not be addressed.

*Judgment reversed. Banke, P. J., and Sognier, J., concur.*

Decided January 8, 1987 —
Rehearing denied January 21, 1987 —

*Charles C. Clay, John K. Dunlap*, for appellant.
*Harmon W. Caldwell, Jr., Harry W. MacDougald*, for appellee.